AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

White Apple iPhone
Seized as Exhibit N-18 in
DEA Case No. R2-23-0166

Case No. **24MJ1861**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C §§ 841, 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shelby Dittmar, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
 telephone  *(specify reliable electronic means)*.

Date: 05/09/2024

*Judge's signature*

City and state: San Diego, California

Hon. Michelle M. Pettit, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Shelby Dittmar, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

> White Apple iPhone
>
> Seized as Exhibit N-18 in
>
> DEA Case No. R2-23-0166

(**Target Device**) as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841 and 846 as further described in Attachment B. The requested warrants relate to the investigation and prosecution of Carlos SANCHEZ-Sevilla for their involvement in a conspiracy to distribute methamphetamine and cocaine. The **Target Device** is currently in the custody of the Drug Enforcement Administration and located at 4560 Viewridge Avenue, San Diego, CA 92123.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a special agent with the Drug Enforcement Administration (DEA) since January 2021. I am presently assigned to San Diego Field Division, Narcotic Task Force. I completed a 16-week Basic Agent's School at the DEA Academy in Quantico, Virginia in May 2021. Prior to my employment with the DEA, I was employed by the St. Louis Metropolitan Police Department in St. Louis, Missouri, for about five years where I worked as a patrol officer and as a detective in various specialized units.

4. During my tenure with DEA, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers.

5. Based upon my training, experience as a special agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, I am also aware that:

   a. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile and they have instant access to telephone calls, text, web, email and voice messages; tending to indicate efforts to import and distribute controlled substances from Mexico into and within the United States as well as smuggle firearms and bulk United States currency from the United States into Mexico;

   b. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

   c. Drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

   d. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

   e. Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units as well as the operational status of checkpoints and border crossings;

   f. The use of digital devices like cellular telephones, tablets and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages,

photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Individuals involved in drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, firearms, drugs, criminal proceeds, and assets purchased with criminal proceeds.

h. Individuals involved in drug trafficking may utilize laptop computers and cellular telephones to generate or save documents to track proceeds or inventory related to the movement of narcotics or drug proceeds and may visit websites to research or support false background stories in an attempt to create a front of a legitimate operation.

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that laptop computers and cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as documents, emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone or laptop computer. Specifically, searches of laptop computers and cellular telephones of individuals involved in the importation of narcotics may yield evidence:

a. tending to indicate efforts to import and distribute controlled substances within the United States and between the United States and Mexico, as well as export firearms and bulk United States currency from the United States into Mexico;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and distribution of controlled substances within the United States and between the United States and Mexico, as

3

well as the exportation of firearms and bulk United States currency from the United States into Mexico;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation and distribution of controlled substances within the United States and between the United States and Mexico, as well as the exportation of firearms and bulk United States currency from the United States into Mexico;

d. tending to identify travel to or presence at locations involved in the importation and distribution of controlled substances within the United States and between the United States and Mexico, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

7. On August 30, 2023, at about 10 a.m., Carlos SANCHEZ-Sevilla applied for entry through the SENTRI lane at the San Ysidro Port of Entry (POE) as the driver and sole occupant of a silver Toyota FJ Cruiser bearing California license plate KARL055. SANCHEZ was also found to be the registered owner of the vehicle. While at the primary inspection point, SANCHEZ provided his United States passport and told a Customs and Border Protection officer (CBPO) that he was entering the United States to go to a dentist appointment and had nothing to declare. SANCHEZ and the vehicle were referred to secondary inspections where CBPO officers discretely conducted further inspections of the vehicle and observed anomalies in the body of the vehicle. CBPO observed what appeared to be multiple packages concealed within the body of the vehicle and further received an alert indicating the presence of narcotics from a Canine Enforcement Officer.

8. To further the investigation, the packages were left in place and a controlled-delivery operation was conducted by Homeland Security Investigations (HSI). Agents

followed SANCHEZ as he drove the vehicle to a fast-food restaurant (Carl's Jr.) parking lot on Dennery Road in San Diego, California. Agents then saw SANCHEZ turn the vehicle over to an individual later identified as Ramon Rubalcava-Nunez. Rubalcava drove the vehicle to a residence at 429 Westby St., Chula Vista, California, followed by a Ford Fusion being driven by a man named Juan Felipe Rubio-Sandez. The two men met up with a third man named David Ruvalcaba-Tortoledo, and Rubalcava-Nunez drove the car into the residence's garage. Agents applied for a federal search warrant for the residence, which was subsequently signed by the Honorable William V. Gallo.

9. HSI agents executed the search warrant and detained Rubalcava, Rubio, Tortoledo, who had been in the garage. During a subsequent search, agents located and seized 281 packages filled with a substance that later tested positive for the characteristics of methamphetamine (total packaged weight of approximately 179 kilograms) and 3 brick-shaped packages containing a substance that later tested positive for the characteristics of cocaine (total packaged weight of approximately 3.4 kilograms). Agents also located packaging materials, suspected drug trafficking proceeds, and suspected drug ledgers.

10. Rubalcava-Nunez was advised of his *Miranda* Rights and agreed to speak with agents. During the interview, Rubalcava-Nunez admitted to being directed by an individual from Mexico known as "Tulipan" to pick up the vehicle and unload the narcotics.

11. On August 31, 2023, a federal arrest warrant was issued for SANCHEZ for his involvement in the above-described events.

12. On October 2, 2023, SANCHEZ attempted to enter the United States from Mexico as a passenger in a family member's vehicle through the San Ysidro POE. SANCHEZ was placed under arrest in accordance with the arrest warrant and **Target Device** was seized pursuant to his arrest.

13. On the same day, DEA agents conducted a post-*Miranda* interview with SANCHEZ at the San Ysidro POE along with the assistance of a Spanish–English interpreter. During the interview, SANCHEZ made statements inconsistent with his

statement to the CBPO at the San Ysidro POE primary inspection point on August 30, and with the other observations made of SANCHEZ while he was under surveillance that day. When agents confronted SANCHEZ with the inconsistencies in his story, SANCHEZ requested to end the interview.

14. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that SANCHEZ knowingly participated in a conspiracy to distribute illegal narcotics and used the **Target Device** in ways described in this affidavit. As such, I believe that valuable information such as telephone numbers, contact names, email addresses, messages, pictures, and other digital information are stored in the memory of the **Target Device,** and that there is probable cause to search the **Target Device** for evidence of crimes as described in Attachment B. I hereby request that the court issue a warrant authorizing law enforcement agents or other federal and state law enforcement officers to search the **Target Device**, and seize the items listed in Attachment B, utilizing the manual methodology described below.

15. Further, in my training and experience, I know it to be common for individuals to communicate before, during, and after the transportation of large quantities of narcotics from one location to another. These communications may begin weeks before an event and extend for weeks afterwards in order to organize the collection and transportation of proceeds related to the trafficking activity. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts the narcotics or plan additional criminal activity. Based on my training and experience, it is also not unusual for individuals, such as the defendants, to attempt to minimize the amount of time they were involved in their narcotics-related activities, and for the individuals to be involved for much longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on June 1, 2023 (approximately 90 days before the offense), up to and including October 3, 2023 (the day after the arrest of SANCHEZ). The reason for this date range is that I

observed messages I suspected to be related to drug trafficking dating back to June 2023 during my preliminary search of one of Rubalcava's phones after he provided consent for that phone during his post-*Miranda* interview.

## METHODOLOGY

16. It is not possible to determine, merely by knowing the cellular phone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants, and have functions such as calendars and full address books and can be minicomputers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will

employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

18. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

19. Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

**CONCLUSION**

20. Based on the facts and information set forth above, there is probable cause to believe that a search of the Target Devices will yield evidence of violations of Title 21, United States Code, Sections 841 and 846.

21. Because the Target Device was seized at the time of SANCHEZ's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the Target Device. As stated above, I believe that the appropriate date range for this search is from June 1, 2023, to October 3, 2023.

//
//
//
//
//
//
//
//
//
//

8

22. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A, seize the items listed in Attachment B using the above-described methodology.

_____
Special Agent Shelby Dittmar
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 9th day of May, 2024.

_____
Honorable Michelle M. Pettit
United States Magistrate Judge

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

> White Apple iPhone
> Seized as Exhibit N-18 in
> DEA Case No. R2-23-0166
> (**Target Device**)

**Target Device** is currently in the possession of the Drug Enforcement Administration, located at 4560 Viewridge Avenue, San Diego, California 92124.

# ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cell phone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cell phone for evidence described below. The seizure and search of the cell phone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cell phone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **June 1, 2023, to October 3, 2023**:

a. tending to identify attempts to import and distribute controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

d. tending to identify travel to or presence at locations involved in the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico; such as stash houses, load houses, or delivery points;

      e.      tending to identify the user of, or persons with control over or access to, the **Target Device**; or

      f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 841 and 846.